IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

04 SEP 27 PM 2:38

U.S.

USA MOTOR EXPRESS, INC.,           }
                                   }
    **Plaintiff,**                  }
                                   }
v.                                 }        **CASE NO. CV 02-B-2696-NW**
                                   }
RLI INSURANCE COMPANY,             }
                                   }
    **Defendant.**                  }

**ENTERED**

SEP 27 2004

## MEMORANDUM OPINION

Currently before the court is defendant RLI Insurance Company's ("RLI") Motion for Summary Judgment. (Doc. 20.) Plaintiff USA Motor Express, Inc. ("USA") asserts a claim for conversion against RLI for allegedly improperly assessing a short rate penalty against USA when USA cancelled an insurance policy. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

## I.    Factual Summary

During the spring of 2002, USA began searching for trucker's liability insurance to replace a previous policy that would expire on April 8, 2002. (Doc. 21, Ex. C at 17-24.) USA submitted an application to RLI, and RLI later submitted a formal proposal for trucker's liability insurance to USA on April 3, 2002. (Doc. 21, Ex. A; Doc. 25, Ex. C at 270.) RLI's proposal contained three different insurance options with varying premium



and deductible amounts for the policy period beginning April 8, 2002.  (Doc. 25, Ex. C at 273-75.)

On or about April 5, 2002, representatives from USA and RLI met to discuss RLI's proposal.  (Doc. 21, Ex. C at 57-58.)  After RLI's initial proposal was sent and before the meeting, RLI determined it would only offer "Option #3," with a twenty-five thousand dollar deductible, due to concerns about USA's driver turnover rate and its high out-of-service frequency.  (Doc. 21, Ex. D at 53-54; Ex. C at 56-57.)  Option #3 contained an estimated premium amount of $1,119,100, a $25,000 per occurrence deductible, and a monthly reporting premium option.[1]  (Doc. 25, Ex. C at 275; Doc. 21, Ex. C at 53-54.) As material conditions of the proposal, RLI required USA to: (1) deposit $223,820 (20% of the estimated annual premium) into a nonworking escrow account; (2) deposit $25,000 as "collateral for the deductible security agreement;" and (3) provide a letter of credit in the amount of $325,000 within thirty days of coverage being bound.  (Doc. 21, Ex. D at 128-32.)  Coverage on the policy was bound on April 8, 2002.  (Doc. 21, Ex. C at 64.)

USA submitted the first two required amounts under Option #3, a total of $248,000 in cash, to RLI.  (Doc. 21, Ex. D at 129-32.)  However, USA failed to submit the $325,000 letter of credit within thirty days of coverage, and RLI never received the

---

[1]  The 6.60/$100 rate stated on the Option #3 chart was adjusted down to 5.89/$100 during negotiations.  Accordingly, the estimated premium was lowered from the initial amount of $1,254,000 to $1,119,100. (*See* Doc. 21, Ex. C at 53-54; Ex. E at 74.)

letter of credit. (*Id.* at 131.)  The $325,000 letter of credit was due within thirty days of the April 8, 2002, binding date. (Doc. 25, Ex. C at 270, 275.)

On April 9, 2002, USA suffered a hazardous materials loss in St. Louis, Missouri. (Doc. 21, Ex. C at 64; Ex. D at 155-56.)  USA submitted this claim to RLI for payment under the policy. (*Id.*)  As part of USA's application submitted to RLI, USA specifically indicated that its revenue for motor truck cargo consisted of 100% non-hazardous cargo. (Doc. 21, Ex. A at 6.)  The sections to mark hazardous cargo were left blank. (*Id.*)  Therefore, USA misstated whether it transported hazardous cargo on its application to RLI. (Doc. 21, Ex. C at 84.)  It is not clear whether RLI received information from other sources that indicated USA hauled hazardous cargo.  Upon requesting additional information clarifying the amount of revenue USA received from hauling hazardous cargo, RLI advised USA that its claim would be paid, and no changes in coverage or premium would be made. (*Id.* at 69-70, 75-76; Ex. D at 166.)  USA asserts that it concluded, from comments made by RLI representatives, that RLI might cancel the policy. (Doc. 21, Ex. C at 69-77.)  USA's April 9, 2002, claim was fully paid by RLI, and USA does not contend that coverage or payment of the claim remains at issue. (*Id.* at 64.)

On April 10, 2002, RLI, in accordance with standard procedure on every new account, contacted Professional Safety Consulting, Inc. to request that a loss control survey be conducted on USA. (Doc. 21, Ex. D at 185-88.)  RLI requires a loss control report be completed within 10 days of binding coverage. (*Id.* at 187-88.)

On April 8, 2002, the same day the RLI policy took effect, USA employed an insurance broker, Farris Evans Agency, to continue soliciting bids on its commercial auto insurance to replace the RLI policy. (Doc. 21, Ex. E at 67, 86-88.) USA was disappointed with the financial terms of the RLI policy, and did not believe it could survive under RLI's high premium; USA wanted to find another policy with more suitable terms. (*Id.* at 64-67.) USA decided to cancel the RLI policy on April 26, 2002, eighteen days after the binding date. (*Id.* at 73; Doc. 25, Ex. E.) USA obtained coverage with Diamond States Insurance Company because Diamond States offered more favorable terms. (Doc. 21, Ex. E at 73-74.) The Diamond States premium coverage rate was 5.88 instead of 5.89, but the per occurrence deductible was only $5,000, compared to $25,000 on the RLI policy. (*Id.* at 73-75; Doc. 21, Ex. F.) USA's decision to cancel the RLI coverage was based upon the more favorable financial terms USA received from Diamond States, and USA's concern that RLI might cancel the policy. (Doc. 21, Ex. E at 80-81.)

After USA cancelled its policy with RLI, RLI assessed a short rate cancellation penalty of $161,150, or 14.4% of the estimated annual premium, as permitted under the terms of the policy. (Doc. 21, Ex. D at 113, 116; Ex. H ¶ 2.) The purpose of the short rate penalty is to compensate "the insurance company for the underwriting, and claim costs, while coverage is in effect." (Doc. 21, Ex. H ¶ 2; Doc. 25, Ex. L ¶ 6.) The short rate penalty is also meant to "penalize insureds who in the middle of a policy period jump from one carrier to another carrier because they found a cheaper price." (Doc. 21, Ex. D

at 103, 149.)  The RLI policy states that "[i]f the first Named Insured cancels, the refund may be less than pro rata." (Doc. 21, Ex. K at 485.)  RLI calls a less than pro rata refund a short rate penalty.  (Doc. 21, Ex. D at 101-02.)  The policy does not state a specific percentage to be applied as a short rate penalty.  (*Id.* at 141, 145.)  To calculate the short rate penalty, RLI used "The Ronoco Calculator," a mathematical wheel used in the insurance industry.  (Doc. 21, Ex. H ¶ 2; Ex. L.)  RLI also calculated the penalty in accordance with the state-approved ISO manual by combining the pro rata earned premium amount with an assessed penalty equal to 10% of the unearned premium amount.  (Doc. 21, Ex. D at 113, 116, 135 and ex. 7 at RLI 0080.)

Ray Mahan, USA's Risk Manager, wrote RLI on July 25, 2002 to dispute the short rate penalty amount, and to request a copy of the policy at issue.  (Doc. 21, Ex. G.)  USA received a proposal and binder in April 2002, but neither mentioned the short rate penalty set out in the policy's "Common Policy Conditions."  (Doc. 25, Ex. A at 485; Ex. B at 85-90, 99-100.)  Mahan believed RLI was entitled to an earned premium amount of $53,260, which represented the pro rata amount of the earned premium for the eighteen day period. (Doc. 21, Ex. G.)  Accordingly, Mahan disputed RLI's entitlement to the remainder of the short rate penalty, an amount of $107,890.  (*Id.*)  RLI responded to Mahan's letter on August 6, 2002 and explained its mathematical calculations, which resulted in a $161,150 short rate penalty.  (Doc. 21, Ex. H ¶ 2.)  RLI informed USA that RLI would deduct the short rate penalty from the $223,820 previously deposited by USA in a non-working escrow account.  (*Id.* ¶ 7.)  RLI also stated it would retain the balance, $62,670, "as

deductible collateral, to cover any claims in which [USA] fails to reimburse RLI for the deductible." (*Id.*)

Unhappy with RLI's decisions and figures, Mahan sought relief from Myra Frick, a rate supervisor at the Alabama State Department of Insurance. (Doc. 21, Ex. C at 99-101.) Mahan sought to determine whether RLI was authorized to assess a short rate penalty, and to check RLI's filings with the Department of Insurance. (*Id.*) Myra Frick determined RLI was entitled to assess the penalty in the manner and amount it was assessed. (*Id.* at 105-06; Ex. J ¶ 4.) Plaintiff then filed the instant case. (Doc. 1, 33.)

## II.   Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a

-6-

genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor.  *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.   Discussion

### A.   No ambiguity exists.

The issue of whether the terms of an insurance policy are ambiguous is a question of law to be decided by the trial court. *Continental Elec. Co. v. American Employers' Ins. Co.*, 518 So. 2d 83, 85 (Ala. 1987).  Alabama law requires that it is the court's duty to "enforce the contract as written" when no ambiguities in the terms of an insurance contract exist. *Turner v. U.S. Fidelity & Guar. Co.*, 440 So. 2d 1026, 1028 (Ala. 1983). When the meaning of undefined terms in an insurance policy are unknown, Alabama courts have held that the terms should be given the same meaning that a person of ordinary intelligence would reasonably give to those terms. *St. Paul Fire & Marine Ins. Co. v. Edge Mem'l Hosp.*, 584 So. 2d 1316, 1322 (Ala. 1991).  Terms within policies are only ambiguous when they are susceptible to more than one meaning. *Sang v. Jefferson County Bd. of Educ.*, 652 So. 2d 310, 312 (Ala. Civ. App. 1994).  "The mere fact that adverse parties contend for different constructions [of a particular policy provision] does

not of itself force the conclusion that the disputed language is ambiguous." *Upton v. Miss. Valley Title Ins. Co.*, 469 So. 2d 548, 554 (Ala. 1985) (citation omitted).

The insurance policy at issue is a commercial auto insurance policy issued by RLI to USA. The policy was in full force and effect from April 8, 2002 through April 26, 2002, the date USA cancelled the policy. As a result of USA's cancellation, the policy authorizes the assessment of a short rate penalty pursuant to paragraph five under Section A of the "Common Policy Conditions." It states:

> 5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. **If the first Named Insured cancels, the refund may be less than pro rata**. The cancellation will be effective even if we have not made or offered a refund.

(Doc. 25, Ex. A at 485 (emphasis added).) This paragraph clearly states that when the insured cancels the policy, as in this case, "the refund may be less than pro rata." (*Id.*) The above paragraph is not ambiguous, and the evidence shows that USA's representative, Mahan, understood the term "pro rata." (Doc. 21, Ex. C at 95-99.) Mahan stated a pro rata refund is when you "take the number of days that the policy was in force and see what that ratio is for the policy period itself." (*Id.* at 96.) Pro rata is defined as "[p]roportionately; according to an exact rate, measure, or interest." Black's Law Dictionary 1257 (8th ed. 2004). Mahan also testified that when one calculates the "pro rata" amount and the "earned premium" amount, he would arrive at the same number. (*Id.* at 96-97.) As plaintiff's representative has reasonably concluded what the term pro rata means, and all other terms in the paragraph may be interpreted according to their

ordinary, everyday plain meanings, there is no ambiguity.  It is clear that when an insured

cancels the policy, the refund he receives may be less than the pro rata amount.

Therefore, there is no ambiguity with the phrase "the refund may be less than pro rata."

**B.**     **The short rate provision was approved by the Alabama Department of Insurance.**

In the State of Alabama, the Department of Insurance ("DOI") is charged with

regulating insurance companies.  Ala. Code §§ 27-2-1 *et seq*.  The DOI is charged with

regulating the rates and rating systems used by insurers in Alabama to charge insureds.

*See* Ala. Code §§ 27-13-1 *et seq*.  Specifically, the DOI approves the rating systems filed

by insurance companies, which are used by each insurance company to base its rates.

Ala. Code § 27-13-30.  In addition, each insurance policy form or application form used

by insurance companies must be filed with and approved by the DOI prior to its use in

Alabama.  Ala. Code § 27-14-8.  The insurance commissioner and the DOI have broad

powers, including the power to approve rating systems and to prescribe the methods and

standards for rating systems.  *Tindle v. State Farm General Ins. Co.*, 826 So. 2d 144, 147-

48 (Ala. Civ. App. 2001); *see also* Ala. Code § 27-13-27.

Many insurance companies subscribe to rating organizations that provide standard

insurance forms approved by the DOI for use in Alabama.  RLI is a subscriber to

Insurance Services Organization ("ISO"), an independent agency that produces and

distributes insurance and endorsement forms approved by the DOI for use in Alabama.

*Waikar v. Royal Ins. Co. of Am., Inc.*, 765 So. 2d 11, 16 (Ala. Civ. App. 1999).  As a

member of ISO, RLI has been approved by the DOI to use the ISO policy forms, which

contain the provision at issue. *See* Ala. Code § 27-13-25. The ISO policy form at issue

in this case, which permits RLI and other insurance companies "to charge a short rate

penalty of .10 of the unearned premium, in addition to the earned premium," has been

reviewed and approved by the Alabama DOI. (Doc. 21, Ex. J ¶¶ 2, 4; Ex. C at 101-05

and ex. 10.) The DOI representative, Myra Frick, also "determined that RLI is duly

authorized to utilize this form and rule when an insured cancels prior to the expiration

date." (Doc. 21, Ex. J ¶ 4.)

Based upon the evidence presented, there were two methods of calculating the

short rate penalty. One method included taking 14.4% of the estimated annual premium,

while the other method combined the earned premium amount with 10% of the unearned

premium amount. (Doc. 21, Ex. H ¶ 2; Ex. J ¶ 4.) The total annual premium was

estimated to be $1,119,100. (Doc. 21, Ex. C at 53-54; Doc. 25, Ex. C at 275.) Using

either calculation, the total short rate penalty amount equaled approximately $161,150.,

the amount retained by RLI as a penalty after USA cancelled the insurance policy.[2] (Doc.

21, Ex. H ¶ 2.)

Alabama law gives significant deference to an administrative agency's

interpretation of its own rules and regulations. *Personnel Bd. of Jefferson County v.*

*Bailey*, 475 So. 2d 863, 866 (Ala. Civ. App. 1985). The evidence shows the Alabama

---

[2] The calculated penalty amount varies slightly depending upon the method used for calculation and how the figures are rounded.

Department of Insurance, through its representative Myra Frick, authorized RLI to assess, and approved, the short rate penalty in the manner and amount it was assessed.

**C.     Under Alabama contract law, the short rate provision does not violate public policy, and is a valid liquidated damages provision, not a penalty.**

Plaintiff argues the short rate penalty is void as against public policy, and the DOI's opinion that RLI was authorized to assess the short rate penalty is irrelevant. Plaintiff also believes there is an issue of fact whether the parties intended the provision to provide for damages, or to be a penalty, because its inclusion in the policy was not negotiated. To support these assertions, plaintiff relies on Alabama contract law, but not case law dealing with insurance contracts. Based upon relevant insurance law, the short rate penalty provision operates as a liquidated damages provision, not a penalty.

**1.     The short rate provision is not void as against public policy.**

Insurance contracts are treated differently than other contracts in the State of Alabama. The Alabama DOI regulates and approves all insurance contracts used in the State of Alabama, including the standard ISO contract at issue in this case. Ala. Code § 27-14-8. Accordingly, insurance carriers cannot sell any policy form within the State of Alabama that has not been approved by the Alabama DOI.

The Eleventh Circuit has disfavored making public policy determinations in the insurance context. In *First Alabama Bank of Montgomery v. First State Insurance Co.*, 899 F.2d 1045, 1064 (11th Cir. 1990), the court stated: "we need not place this court in the awkward position of being a federal forum divining a state's public policy." RLI cites

as the test used in public policy cases, "to determine whether a contract is unenforceable

because of public policy is 'whether the public interest is injuriously affected in such

substantial manner that private rights and interests should yield to those of the public.'"

*J.C. Bradford & Co. v. Vick*, 837 So. 2d 271, 275 (Ala. 2002) (citations omitted).  In this

case, USA does not assert that all short rate provisions should be declared void as against

public policy, only that the provision in this case is void as against public policy.  (Pl.'s

Br. in Opp'n to Summ. J. at 10.)  USA's argument fails, as public policy is meant to

protect the public as a whole, not one company under one contract.

The Southern District of Alabama refused to contravene an Alabama DOI

determination, stating:

> In Alabama, the regulation of insurance rates, rating systems and policy
> forms is purely a legislative function.  The Alabama legislature has created
> the department of insurance and has provided that the commissioner is to
> regulate and approve rates, rating systems and policy forms filed by
> insurance companies.  As discussed fully above, it is the commissioner,
> based on his training and experience, who determines whether a particular
> rate or rating system filed by an insurance company for use with a particular
> form is unreasonably high, excessive or unfairly discriminatory, and
> whether the forms submitted comply with the laws and public policy of the
> state.

*Allen v. State Farm Fire & Cas. Co.*, 59 F. Supp. 2d 1217, 1229 (S.D. Ala. 1999).  The

court added that "[t]he commissioner has the expertise in the area of setting insurance

rates . . . and the commissioner's judgment on this issue should not be overridden by a

court."  *Id.* at 1230.  This court agrees.

### 2.  Under standard Alabama contract law, the short rate provision is a valid liquidated damages provision.

Under Alabama contract law, "liquidated damages are a sum to be paid in lieu of performance, *Forsythe v. Central Foundry Co.*, 198 So. 706 (1940), while a penalty is characterized as a security for the performance of the agreement or as a punishment for default. *Standard Tilton Milling Co. v. Toole*, 137 So. 13 (1931)." *Camelot Music, Inc. v. Marx Realty & Improvement Co.*, 514 So. 2d 987, 990 (Ala. 1987).  There are three criteria to distinguish a valid liquidated damages clause from a penalty, and all three are relevant to this case.  "First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach [estimate] of the probable loss."  *Id.*; *Alverson v. Trans-Cycle Industries, Inc.*, 726 So. 2d 670, 677 (Ala. Civ. App. 1998); *see also* C. Gamble and D. Corley, *Alabama Law of Damages*, § 5-4 (1982).

All three criteria are satisfied.  The injury caused to RLI by USA's termination of the insurance contract is not fully known.  While the parties have a general idea of what the total injury would have been, the amount of damages is not clear.  The total premium due to RLI was based upon USA's gross receipts, which would not have been determined until the policy term ended, making damages very difficult to accurately estimate at the time of contracting.  Second, the short rate penalty provision was intended to provide damages to RLI if USA breached the contract by terminating it early.  Third, the amount

-13-

retained by RLI as a short rate penalty was calculated, as discussed *supra*, pursuant to standard practices in the insurance industry.

This court finds that the short rate penalty provision does not violate public policy and that it acts as a valid liquidated damages provision. In addition, the short rate penalty provision contained in the standard ISO form used by RLI to bind insurance coverage with USA was approved by the Alabama Department of Insurance. Therefore, RLI's motion for summary judgment is due to be granted.

## IV.    Conclusion

For the reasons stated herein, the court is of the opinion that no genuine issues of material fact exist and defendant RLI is entitled to judgment as a matter of law. An Order granting RLI's Motion for Summary Judgment will be entered contemporaneously with this Opinion.

**DONE** this the _27th_ day of September, 2004.

**SHARON LOVELACE BLACKBURN**
United States District Judge

-14-